## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

CLARENDON NATIONAL INSURANCE
COMPANY,

                      Plaintiff,

          v.

HEALTH PLAN ADMINISTRATORS, INC.,
INSURERS ADMINISTRATIVE CORPORATION and
J. KIM WALKER a/k/a KIM K. WALKER a/k/a J K
WALKER a/k/a JEANNE K. WALKER a/k/a JOANNE
K. WALKER a/k/a JEANNE KIM WALKER a/k/a J K
ALKER a/k/a KIM WALKER a/k/a J KIM WALLKER
a/k/a JOHN KIMBALL WALKER a/k/a JEANNE A
WALKER a/k/a JAN KIM WALKER a/k/a JOHN J
WALLER a/k/a KIM WALKER UNICORE a/k/a JOHN
KIM WALKER a/k/a JOHN K. WALKER a/k/a J
WALKER a/k/a KIM J WALKER a/k/a JAN K
WALKER,

                      Defendants.

-------------------------------------------------------------X

Case No.: 08 cv 6279

Judge: George B. Daniels, USDJ

Magistrate: Ronald L. Ellis, USMJ

**COMPLAINT**

      Plaintiff, **CLARENDON NATIONAL INSURANCE COMPANY**

("Clarendon"), by its undersigned attorneys, for its complaint against Defendants Health

Plan Administrators, Inc. ("HPA"), Insurers Administrative Corporation ("IAC") and J.

Kim Walker a/k/a Kim K. Walker a/k/a J K Walker a/k/a Jeanne K. Walker a/k/a Joanne

K. Walker a/k/a Jeanne Kim Walker a/k/a J K Alker a/k/a Kim Walker a/k/a J Kim

Wallker a/k/a John Kimball Walker a/k/a Jeanne A Walker a/k/a Jan Kim Walker a/k/a

John J Waller a/k/a Kim Walker Unicore a/k/a John Kim Walker a/k/a John K. Walker

a/k/a J Walker a/k/a Kim J Walker a/k/a Jan K Walker ("WALKER"), alleges as follows:

### Jurisdiction and Venue

1.      Jurisdiction of this Court is conferred by diversity of citizenship under 28 U.S.C. § 1332.

2.      Plaintiff Clarendon is an insurance company incorporated under the laws of the State of New Jersey, with its principal place of business in the City, County and State of New York.

3.      On information and belief, Defendant HPA was, until its involuntary dissolution on or about June 13, 2008, incorporated under the laws of the State of Illinois, and had or has its principal places of business in the State of Illinois.

4.      On information and belief, Defendant IAC is incorporated under the laws of the State of Arizona, and has its principal place of business in the State of Arizona.

5.      Defendant WALKER is a natural person and, on information and belief, is a citizen of the state of Florida.

6.      The amount in controversy exceeds $75,000.00 exclusive of interest and costs.

### Nature of the Dispute; Venue

7.      This action involves claims asserted by Clarendon arising out of and relating to:

           a)  a Claims Administration Agreement among Clarendon, HPA and WALKER, effective as of March 1, 2004 (hereinafter referred to as the "Claims Agreement") a true and correct copy of which is attached hereto as Exhibit A; and

           b)  a Guarantee of Payment of Trust Funds, also dated March 1, 2004, executed in Clarendon's favor by WALKER as guarantor, and incorporated into

the Claims Agreement as Schedule 2  (hereinafter referred to as the "Guarantee") (*See* Exhibit A, Claims Agreement, Schedule 2).

8.      Under the Claims Agreement, HPA, agreed to indemnify Clarendon against any and all claims, losses, damages, and expenses, including but not limited to losses in excess of policy limits and extra-contractual obligations, directly or indirectly arising out of or relating to, among other things, (i) the negligence of HPA or its employees or representatives in discharging its obligations to Clarendon or its policyholders or (ii) any failure by HPA or its employees, representatives, independent adjusters or approved subcontractors to perform its obligations under or relating to the Claims Agreement.  Exhibit A, Claims Agreement, Article 5.

9.      Under the Guarantee, WALKER, as a principal shareholder and/or president of HPA, guaranteed the payment of Trust Funds due Clarendon or the insureds under Clarendon's policies.  Trust Funds are defined as "loss payments and related loss adjustment expenses, salvage, subrogation and contribution recoveries and collections, deductible reimbursement collections and any other funds due the Company [*i.e.*, Clarendon] or due the insureds under the Policies covered by the Claims Agreement ...." Exhibit A, Claims Agreement, Schedule 2, Recital ¶A.

10.      HPA is a fiduciary of Clarendon with respect to the Trust Funds.  Exhibit A, Claims Agreement, §8.2(a); Schedule 2, Recital ¶A.

11.      Jurisdiction and venue of this action are proper in this Court because Defendants HPA and WALKER agreed to such jurisdiction in the Claims Administration Agreement and Guarantee.  Exhibit A, Claims Agreement, §8.4 and Schedule 2.

## Parties

12.     Clarendon is an insurance company duly organized and existing under the laws of the State of New Jersey, with its principal place of business at 466 Lexington Avenue, New York, NY 10017.

13.     On information and belief, HPA was, until its involuntary dissolution on or about June 13, 2008, a corporation organized and existing under the laws of the State of Illinois, and having its principal place of business at 3703 N. Main Street, Rockford, IL 61103.

14.     On information and belief, IAC is a corporation organized and existing under the laws of the State of Arizona, and having its principal place of business at 2101 W. Peoria Avenue, Phoenix, AZ 85029.  IAC is named as a defendant in this action by reason of its recent purchase of or merger with HPA and, on information and belief, its status as successor to HPA's assets and liabilities.

15.     On information and belief, WALKER is a natural person, a principal shareholder or President of HPA, and is a citizen of the State of Florida, residing at 9848 SE Sandpine Lane, Hobe Sound, FL 33455.

## Common Allegations

16.     Under the Claims Agreement and Guarantee entered into by Clarendon, HPA and WALKER, HPA agreed to administer and adjust all claims arising under certain health insurance policies issued on behalf of Clarendon by HPA in its capacity as Clarendon's Managing General Underwriter.

17.     The Claims Agreement expressly obligates HPA, among other things, to: (i) "... administer and adjust all claims arising under the policies in compliance with all governmental statutes, rules, or regulations of any applicable jurisdiction" (Claims

Agreement, §2.1(b)); (ii) "... be and remain in compliance with ... all applicable local, state and federal laws and regulations ... affecting the business conducted under and pursuant to the terms of this Agreement" (Claims Agreement, §2.1(e)); (iii) perform reasonable and necessary administrative and clerical work, including proper investigation of all claims (Claims Agreement, §2.2(c)(i); and (iv) "[a]djust, settle and bring to a conclusion those claims which the Administrator determines the Company is legally obligated to pay in accordance with applicable law or the terms of the Policies" (Claims Agreement, §2.2(c)(v)).

18.     Funds made or to be made available by Clarendon for the payment of claims and related expenses (defined as "Loss Adjustment Expenses") are expressly denominated by the Claims Agreement and Guarantee as Trust Funds, with respect to which HPA is Clarendon's fiduciary.  Claims Agreement, §§2.4(a) and (b), 8.2(a).

19.     Under Section 5.1 of the Claims Agreement, HPA must indemnify Clarendon against, among other things, any losses, judgments, claims, expenses (including attorneys' fees), losses in excess of policy limits and extra-contractual obligations incurred by Clarendon, which directly or indirectly arise out of or relate to:  (i) negligence of HPA or its employees or representatives in discharging HPA's obligations to Clarendon or its policyholders, (ii) failure by HPA or its employees or representatives to comply with any applicable information privacy laws, or (iii) failure by HPA or its employees, representatives, independent adjusters or approved subcontractors to perform HPA's obligations under or relating to the Claims Agreement.

20.     Under the Guarantee, WALKER unconditionally guarantees to Clarendon "the full and prompt payment of Trust Funds as and when they are due and payable pursuant [to] the Claims Agreement."  Trust Funds expressly include, but are not limited to, loss payments owed to Clarendon's policyholders.  Claims Agreement, Schedule 2, Recital ¶A; "Therefore clause."  WALKER, as Guarantor, waived, among other things, notice of default or non-performance and the performance of any condition precedent to which the Guarantor might otherwise be entitled.  Claims Agreement, Schedule 2, ¶1.

The obligations of WALKER as Guarantor are absolute, unconditional, and remain in full force and effect regardless of any circumstance or occurrence.  Claims Agreement, Schedule 2, ¶3.

21.    In violation of its contractual obligations and fiduciary duties to Clarendon, HPA failed to administer in accordance with applicable law, regulations and professional standards the claims relating to the following policyholders of Clarendon (collectively, the "Subject Claims" and "Subject Policies"):

a.    Marshall Ainsworth, Policy No. 428909371;

b.    Patricia Baxter, Policy No. 524480676;

c.    Jack Bodne, Policy No. 261542880;

d.    Susan Brimhall, Policy No. 520584643;

e.    Nicholas Cohen, Policy No. 124669986;

f.    Kimberly Gregg, Policy No. 461159235;

g.    Cody Jaynes, Policy No.448024890;

h.    Ted (Jim) Jolly, Policy No. 456606170;

i.    Deborah LaRew, Policy No. 015605722;

j.    Marilyn O'Bar, Policy No. 447402835;

k.    Theresa Palmquist, Policy No. 461973123;

l.    Iris Sims, Policy No. 027409679;

m.    Brandy Smith, Policy No. 461316710;

n.    Elizabeth Stefanik, Policy No. 555319695;

o.    Lonnie Walker, Policy No. 447446215; and

p.    Joe Zuniga, Policy No. 288488682.

22.    More particularly, HPA rescinded most if not all of the Subject Policies on the basis of allegedly inaccurate statements by the policyholders in their applications for insurance, without investigating or determining, as required by applicable law, whether such statements had been made with intent to deceive.

23.     In the remainder of the Subject Claims, HPA failed, among other things, to adhere to applicable law relating to pre-existing conditions, and/or failed to properly verify coverage.

24.     As a result of HPA's failure to administer and adjust the Subject Claims in accordance with applicable law, regulation and professional standards, including, but not limited to, its rescission of the Subject Policies without proper investigation, its inadequate verification of coverage, and its failure to comply with applicable laws relating to pre-existing conditions, the affected policyholder/claimants instituted legal proceedings and/or took other legal action against Clarendon, as a result of which Clarendon has suffered injury and incurred losses amounting to no less than $5,080,340.00.  In addition, Clarendon expects to incur additional losses as a result of HPA's actions and omissions in an amount not presently known.

25.     By letter dated May 5, 2008, Clarendon made written demand upon HPA for indemnification in accordance with the Claims Agreement.  HPA has to date failed and refused to so indemnify Clarendon in accordance therewith.


### AS AND FOR A FIRST CAUSE OF ACTION
### AGAINST HPA AND IAC
### FOR BREACH OF CONTRACT

26.     Clarendon repeats and realleges each and every allegation set forth in paragraphs 1 through 25 as if set forth fully herein.

27.     HPA's failure to administer, adjust and pay the Subject Claims in accordance with applicable law, regulation and professional standards was in violation of its obligations under the Claims Agreement.

28.     As a direct and proximate result of HPA's failure to administer, adjust and pay the Subject Claims in accordance with its contractual obligations, Clarendon has

suffered damages aggregating no less than $5,080,340.00, and is entitled to recover such amount from HPA, or from IAC as HPA's successor in interest, as well as all further loss, costs, and expenses incurred by Clarendon to time of trial with respect to the Subject Claims.

## AS AND FOR A SECOND CAUSE OF ACTION
## AGAINST HPA AND IAC
## FOR BREACH OF FIDUCIARY DUTY

29.    Clarendon repeats and realleges each and every allegation set forth in paragraphs 1 through 28 as if set forth fully herein.

30.    HPA's failure to properly administer, adjust and pay when due the Subject Claims was a breach of its fiduciary duty to Clarendon to pay Trust Funds owed to Clarendon's policyholders.

31.    As a result of HPA's failure to properly administer and disburse the Trust Funds owed to Clarendon's policyholders, Clarendon has suffered damages aggregating no less than $5,080,340.00 and is entitled to recover from HPA, or from IAC as HPA's successor in interest, such loss, as well as all further loss, costs, and expenses incurred by Clarendon to time of trial with respect to the Subject Claims.

## AS AND FOR A THIRD CAUSE OF ACTION
## AGAINST HPA AND IAC
## FOR NEGLIGENCE

32.    Clarendon repeats and realleges each and every allegation set forth in paragraphs 1 through 31 as if set forth fully herein.

33.     HPA's failure to administer, adjust and pay the Subject Claims in accordance with applicable law, regulation and professional standards breached the duty of due care HPA owed to Clarendon as its fiduciary.

34.     As a result of HPA's failure to administer, adjust and pay the Subject Claims in accordance with applicable law, regulation and professional standards, Clarendon has suffered damages aggregating no less than $5,080,340.00 and is entitled to recover from HPA, or from IAC as HPA's successor in interest, such loss, as well as all further loss, costs, and expenses incurred by Clarendon to time of trial with respect to the Subject Claims.

## AS AND FOR A FOURTH CAUSE OF ACTION
## AGAINST HPA AND IAC
## FOR INDEMNIFICATION

35.     Clarendon repeats and realleges each and every allegation set forth in paragraphs 1 through 34 as if set forth fully herein.

36.     HPA's failure to comply with applicable law, perform reasonable and necessary administrative and clerical work, and properly investigate, adjust and pay the Subject Claims constituted (i) negligence in discharging its obligations to Clarendon and Clarendon's Policyholders, in breach of HPA's fiduciary duties and (ii) breach of HPA's contractual duties under the Claims Agreement, entitling Clarendon to indemnification by HPA, or by IAC as HPA's successor in interest, for its losses resulting from such negligence and breach of contractual duties, in the sum of not less than $5,080,340.00 plus all future losses incurred by Clarendon as a result of such negligence and breach of contractual duties.

## AS AND FOR A FIFTH CAUSE OF ACTION
## AGAINST WALKER AS GUARANTOR

37.     Clarendon repeats and realleges each and every allegation set forth in paragraphs 1 through 36 as if set forth fully herein.

38.     Under the Guarantee, WALKER unconditionally and irrevocably guaranteed HPA's payment of Trust Funds due Clarendon's insureds under the Subject Policies.

39.     As a result of HPA's failure to pay the Trust Funds due to Clarendon's insureds under the Subject Policies, Clarendon has incurred losses of at least $5,080,340.00 and is accordingly entitled to reimbursement by WALKER of such amount, as guarantor, as well as any and all additional losses incurred by Clarendon with respect to the Subject Claims.

**WHEREFORE**, Clarendon demands judgment:

1.     On the first cause of action for compensatory damages in the sum of no less than $5,080,340.00, with interest from the respective dates that Clarendon made payments with respect to the Subject Claims;

2.     On the second cause of action for compensatory damages in the sum of no less than $5,080,340.00, with interest from the respective dates that Clarendon made payments with respect to the Subject Claims;

3.     On the third cause of action for compensatory damages in the sum of no less than $5,080,340.00, with interest from the respective dates that Clarendon made payments with respect to the Subject Claims;

4.      On the fourth cause of action for indemnification in the sum of no less than $5,080,340.00, with interest from the respective dates that Clarendon made payments with respect to the Subject Claims;

5.      On the fifth cause of action for payment under the Guarantee in the sum of no less than $5,080,340.00, with interest from the respective dates that Clarendon made payments with respect to the Subject Claims; and

6.      On each and every cause of action, all additional damages incurred to the time of trial, plus prejudgment interest and costs and expenses incurred by Clarendon herein, including reasonable attorneys' fees together with such other and further relief as the court deems just and proper.

**DATED**:   July 10, 2008

Respectfully submitted,

Wasser & Russ, LLP

By: _/S/_____

Adam H. Russ, Esq. (SDNY # AR 2590)
Wasser & Russ, LLP
80 Maiden Lane, Suite 1502
New York, N.Y. 10038
Tel:   (212) 430-6040
Fax:  (212) 430-6041

# CLAIMS ADMINISTRATION AGREEMENT
(hereinafter called the "Agreement")

between

## HEALTH PLAN ADMINISTRATORS, INC.
(hereinafter called the "Administrator")

and

## CLARENDON NATIONAL INSURANCE COMPANY
(hereinafter called the "Company")

1



## DECLARATIONS PAGE

These Declarations, together with the Agreement and all schedules, exhibits and amendments thereto constitute the Claims Administration Agreement between the Company and the Administrator. Capitalized terms used in these Declarations and not otherwise defined herein shall have the meanings ascribed to them in Section 1.1 in the Agreement (all such meanings to be equally applicable in the singular and plural forms).

A.    Names and addresses of the Parties:

Clarendon National Insurance Company (the "Company")
1177 Avenue of the Americas
New York, NY 10036

Health Plan Administrators, Inc. (the "Administrator")
3703 N. Main Street
Rockford, IL 61103

Health Plan Administrators, Inc.(the "Managing General Underwriter")
3703 N. Main Street
Rockford, IL 61103

J Kim Walker (the "Guarantor")
3703 N. Main Street
Rockford, IL 61103

B.    The Company and the Managing General Underwriter have entered into a managing general underwriting agreement ("MGU Agreement") dated March 1, 2004 for the issuance and administration of Policies in certain states. Other parties to the Agency Agreement include N/A .

C.    Effective Date: March 1, 2004.

D    The Administrator shall notify and consult with the Company for any claim which the Administrator anticipates will result in a loss payment in excess of $25,000 ("Loss Payment Limit").

E.    The Administrator shall not issue checks for any one claim in excess of $25,000 ("Check Amount Limit") without obtaining the Company's prior written consent.

F.    Compensation of the Administrator: The Administrators compensation is set forth in Exhibit A attached to this Declarations Page.

G.    Amount of Payment Bond (if any) to secure Unearned Fees:

$ N/A_____

Dated: New York, NY

2

Attest:

Title:

Attest:

Title:

HEALTH PLAN ADMINISTRATORS, INC.

By:

Chief Operating Officer

CLARENDON NATIONAL INSURANCE COMPANY

By:

DOMINIC J. HAGGER
SENIOR VICE PRESIDENT

3

## EXHIBIT A

## COMPENSATION OF ADMINISTRATOR

For Policies effective on or after March 1, 2004 the Administrator's Compensation shall equal five (4.5%) of the monthly collected premium. The foregoing fee shall be paid to the administrator in the month following the month in which the premium was collected.

4

## RECITALS

A.  The Company entered into a Managing General Underwriting Agreement ("MGU Agreement") with the Managing General Underwriter ("MGU") Health Plan Administrators, Inc. dated March 1, 2004 for the issuance and administration of insurance policies in certain states ("Policies", or individually, "Policy").

B.  The Administrator is experienced in the administration of insurance claims and is duly qualified to administer and adjust claims arising under the Policies.

C.  The Company would like the Administrator to administer and adjust such claims, and the Administrator is willing to do so on behalf of the Company in accordance with the terms of this Agreement.

D. The Company and the Administrator have agreed to amend and restate their rights and obligations under the January 1, 2000 Claims Administration Agreement in this Agreement. The Company and the Administrator agree that any dispute arising under the January 1, 2000 Claims Administration Agreement will be resolved in accordance with the terms of this Agreement.

IN CONSIDERATION OF THE MUTUAL PROMISES EXCHANGED, the parties agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1   Defined Terms.  As used in this Agreement, the following terms have the following meanings, which apply to both the singular and plural forms of the terms defined:

"Administrator" means the entity or entities designated as the Administrator in Item A of the Declarations.

"Administrator's Expenses" is defined in Section 2.5.

"Administrator Indemnitees" is defined in Section 5.2.

"Agreement" means this agreement.

"ALAE" is defined in Section 2.3(a)(ii).

"Change of Control" is defined in Section 8.3.

"Check Amount Limit" is defined in item E of the Declarations

"Check Register" is defined in Section 2.4(d).

"Claim Recovery Account" Is defined in Section 2.9(a).

5



"Claims Account" is defined in Section 2.4(a).

"Claims Register" is defined in Section 2.4(d).

"Claims Reports" is defined in Section 2.3(a).

"Company" means the entity or entities designated as the Company in Item A of the Declarations.

"Company Indemnitees" is defined in Section 5.1.

"Computer Data" is defined in Section 2.3(b).

"Declarations" means the terms and/or definitions attached hereto on the "Declarations Page"

"Deductible Reimbursement" is defined in Section 2.2(g).

"Effective Date" means the date of this Agreement designated as the Effective Date in Item C of the Declarations.

"MGU Agreement" is defined in Item B of the Declarations.

"Managing General Underwriter" is defined in Item A of the Declarations.

"Guarantor" means the person or persons designated as the Guarantor in Item A of the Declarations.

"LOC" is defined in Section 3.1(c).

"Loss Adjustment Expenses" is defined in Section 2.4(b).

"Loss Payment Limit" is defined in Section D of the Declarations.

"Payment Bond" is defined in Item G of the Declarations

"Policy" is defined in recital A.

"Policyholder" means the holder of a Policy.

"Reinsurance Agreements" is defined in Section 2.4(b).

"Retention Period" is defined in Section 2.3(c).

"SIU" is defined in Section 2.6.

"Software" is defined in Section 2.3(h).

"Subcontractor" is defined in Section 2.8.

"Trust Funds" is defined in Section 8.2(a).



"ULAE" is defined in Section 2.3(a)(ii).

"Unearned Fees" is defined in Section 3.2.

"Unclaimed Funds Register" is defined in Section 2.10.

"Unclaimed Property Policy" is defined in Section 2.10.

### ARTICLE 2
### AUTHORITY AND SERVICES OF ADMINISTRATOR

2.1  Authority.

(a)  The Administrator shall administer and adjust all claims arising under the Policies (including claims under Policies written for the Company's participation in mandatory underwriting facilities, including but not limited to, joint underwriting associations or assigned risk pools) in accordance with the terms and conditions of the Policies and as authorized by the Company.

(b)  The Administrator shall administer and adjust all claims arising under the policies in compliance with all governmental statutes, rules, or regulations of any applicable jurisdiction.

(c)  Notwithstanding the foregoing or anything in this Agreement or elsewhere to the contrary, the Company (i) shall retain ultimate control and responsibility of the functions that it has delegated hereunder, and (ii) has and will retain the final authority over decisions and policies regarding claims administration, including without limitation, the payment or non-payment of claims.

(d)  The Administrator will diligently perform its duties under this Agreement in an ethical, legal and professional manner, and to the best of its abilities.

(e)  The Administrator shall be and remain in compliance with, and shall ensure that all employees, agents, representative, adjusters, investigators, TPA's and subcontractors are in compliance with, all applicable local, state and federal laws and regulations, including, without limitation, the Gramm-Leach-Bliley Financial Services Modernization Act ("GLB"), the Health Insurance Portability and Accountability Act ("HIPAA"), anti-terrorism and anti-money laundering laws, abandoned/unclaimed property laws, and all laws and regulations affecting the business conducted under and pursuant to the terms of this Agreement.

2.2  Services.  The Administrator shall perform the following services in compliance with applicable law and, subject to periodic review and audit thereof by the Company throughout the term of this Agreement:

(a)  Record, examine and promptly report each claim to the Company, as well as any reserve established therefor by the Administrator.

(b)  Maintain a claim file in a paper and / or electronic format for each reported claim. The electronic claims file shall be linked to the Policy system for confirmation of coverage when a claim is reported, this link should clearly identify the Policy and the insured and an activity log.

(c)  Perform reasonable and necessary administrative and clerical work in connection with

7

reported claims, including without limitation, the following:

(i)   Investigate all reported claims to the extent the Administrator deems necessary.

(ii)   Determine and evaluate any coverage issues in connection with the claims and refer same to the Company or counsel with recommendations.

(iii)   Establish appropriate reserves for all claims, subject, however, to the right of the Company to adjust the amounts of such reserves.

(iv)   Deny coverage with respect to those claims which the Administrator determines should be denied based upon applicable law or the terms of the Policies.

(v)   Adjust, settle and bring to a conclusion those claims which the Administrator determines the Company is legally obligated to pay in accordance with applicable law or the terms of the Policies.

(vi)   Adjust claims only by individuals or entities who are properly licensed, and appointed or employed by the Administrator; provided, however, that the Administrator shall not subcontract any of its obligations hereunder (other than hiring local independent adjusters and/or local independent investigators to investigate specific claims) without first obtaining the Company's written consent and approval of the terms of the proposed subcontract. The Administrator shall promptly furnish the Company with such information as the Company may request in order to evaluate the prospective subcontractor.

(vii)   Prepare checks, vouchers, compromise agreements, releases and other documents necessary or desirable to close out claims.

(viii)   Continuously review outstanding claim reserves and recommend to the Company any changes to such reserves deemed necessary by the Administrator; and provide the Company with written monthly reports showing all outstanding claims then being administered by the Administrator, the activity being performed with regard to the claims, and any changes to outstanding reserves as of the date of the report, all as more specifically provided in Section 2.3 of this Agreement. The Administrator shall continuously monitor and report to the Company the percentage of pending claims that ultimately become paid.

(ix)   Record and report promptly to the Company each loss and Loss Adjustment Expense (as defined herein) paid, utilizing mutually agreed upon claim disbursement, checking and coding procedures.

(d)   Periodically review the claims handling procedure with the Company to identify any problems and to arrive at mutually agreeable corrective action.

(e)   Where required, prepare and forward the Company's federal and state 1099 filings and prepare and distribute 1099 Forms to all applicable payees.

(f)   Report suspected fraud as required by any applicable statute or regulation in the state(s) where the Policies are issued.



(g) Diligently prosecute the Company's contribution rights relating to any losses sustained under the Policies, and promptly report to the Company and account for any contribution collections. If a Policy contains deductible or similar provisions (such as a self-insured retention provision) requiring the Policyholder to reimburse the Company for the payment of loss, advance payment of anticipated loss, and/or loss adjustment expenses (collectively, "Deductible Reimbursement"), the Administrator shall be responsible for billing to and collecting from the Policyholder the Deductible Reimbursement, or drawing upon any security deposited by the Policyholder to satisfy the Policyholder's obligation to pay the Deductible Reimbursement. Within ten (10) days after a payment giving rise to a Deductible Reimbursement is made, the Administrator shall send an invoice to the Policyholder for the amount of the Deductible Reimbursement. If the Deductible Reimbursement is not collected within thirty (30) days after the invoice is sent, the Administrator shall send a second invoice to the Policyholder and shall immediately notify the MGU, in writing.

(h) The Administrator shall promptly notify and consult with the Company and refer any coverage question, denial of liability or policy limit demand to the Company for a final determination by the Company, with respect to the following:

(i) Any loss or claim resulting in a lawsuit being instituted against the Administrator or the Company.

(ii) Any claim for policy limits.

(iii) Any claim which involves exposure to the Company in excess of policy limits.

(iv) Any serious complaint (in the judgment of the Administrator) being filed with, or any inquiry regarding such complaint from, any insurance department or other regulatory authority relating to any loss or claim which might result in regulatory action being taken against the Company or the Administrator. In such case (1) the Administrator shall immediately forward to the Company a copy of any written communication received from the regulatory authority, and (2) if a response affecting the Company or the Administrator is required, the Administrator shall, within five (5) business days after the filing of the complaint or receipt of the inquiry, draft a response and submit it to the Company for approval before submitting it to the regulatory authority. The Administrator may respond directly to other complaints or inquiries arising in the normal course of business.

(v) Any loss or claim in respect of which the Administrator makes a determination to deny coverage for reasons not established by applicable law or the terms of the Policies, as well as any coverage dispute.

(vi) Any claim which the Administrator anticipates will result in a loss payment (1) in excess of the Loss Payment Limit, and/or (2) in an amount established by an insurance department having jurisdiction.

(vii) Any claim (1) which is open for more than six (6) months, or (2) which involves extra-contractual allegations, or (3) which involves a minor, or (4) which involves permanent disability or disability for a period of nine (9) months or more, or (5) which involves loss of life or limb, amputation, spinal cord or brain injury, loss of eyesight or hearing, poisoning, extensive burns, or multiple fractures.

(viii) Any potentially catastrophic claims under the Policies, especially those

potentially catastrophic claims requiring intensive and prolonged treatment, including but not limited to any for (1) complications of pregnancy, (2) premature infants and newborn with congenital anomalies, (3) Cancer with metastasis including Leukemia, (4) head/brain injury, (5) Cerebrovascular Accident, (6) Acquired Immune Deficiency Syndrome, (7) Amyotrophic Lateral Sclerosis, (8) spinal cord injury, (9) trauma involving multiple fractures, (10) amputations, and burns covering twenty percent (20%) or more of the body, (11) respirator dependency, (12) coma of two (2) weeks duration or longer, (13) Myocardial Infarction, (14) major organ transplant and/or dialysis, (15) mental disorder or substance abuse requiring hospital confinement, or (16) any other serious injury or illness specified by the Company or the Company's reinsurer.

(ix)    Any denial of coverage for which the insured is represented by legal counsel (1) on the coverage issue, and/or (2) for which coverage is disputed.

(x)    Any suspected fraud, or any allegation of "bad faith" in claims handling against the Administrator or the Company.

(i)    The Administrator shall forward a copy of any claim file to the Company at the Company's request. The forwarded claim file shall include all correspondence and documentation associated with that claim.

(j)    Maintain in good standing all licenses, permits and authorizations necessary or appropriate for the Administrator (and any adjuster, investigator or appraiser employed by the Administrator) to perform services under this Agreement in compliance with all applicable privacy laws, rules and regulations, including the Gramm-Leach-Bliley Act; and the Administrator shall use only independent adjusters, investigators or appraisers who are duly licensed in the states where their services are performed.

(k)    Neither the Administrator nor anyone appointed by it shall have any right or authority (1) to alter, modify, or terminate any Policy, (2) to waive any Policy provision, or (3) to commit the Company to any claim settlement with any of the Company's reinsurers, without the prior written consent of the Company.

(l)    The Administrator is responsible for ensuring that claims are administered according to customary and usual customer service, claims administration and information privacy standards. The Administrator shall promptly respond to inquiries, correspondence and communications, whether written, telephonic or electronic. All matters affecting claims shall be performed in a timely and competent manner, and in compliance with usual insurance industry, regulatory and professional standards while maintaining the confidentiality of all information. The Administrator shall ensure that it has sufficient staffing and systems to perform all its functions and obligations hereunder, and to assist in servicing the claims, as required by this Agreement.

(m)    The Administrator shall not employ or continue to employ, as an officer, director, employee, agent, subcontractor, or other person authorized to act on behalf of the Administrator, any individual who has ever been convicted of any state or federal criminal felony involving dishonesty or a breach of trust or any crime under 18 U.S.C. § 1033 unless the individual has obtained the prior written consent of the insurance regulatory official possessing regulatory authority over such individual.

(n)    The Administrator shall be responsible for providing any of its employees, agents, representative, contractors and subcontractors, who are performing direct or indirect services for the

Policies or Policyholders, with a copy of the Company's privacy policies and practices, and for ensuring that such employees, agents, representative, contractors and subcontractors are complying with such privacy policies and practices.

2.3  Claims Reports, Files, Data and Software.

(a)  The Administrator, at its sole cost, shall provide claims reports ("Claims Reports") to the Company, whether on hard copy, disks or tapes or electronically, within seven (7) days after the end of each calendar month unless otherwise set forth herein. The Claims Reports shall include the following:

(i)  Information and statistical data (1) necessary for the Company to prepare any reports required by the National Association of Insurance Commissioners and (2) necessary for any other purpose the Company may reasonably request same, including without limitation, to enable the Company to monitor and evaluate the business written under the MGU Agreement, and to enable the Company to comply with any state or rating agency reporting requirements now or hereafter in effect. All information required by the Company to evaluate the business or to comply with state or rating agency reporting requirements shall be deemed to have been reasonably requested. The Administrator shall furnish all such reports to the Company at least fifteen (15) days prior to applicable filing deadlines, notwithstanding any contrary time provisions in this Agreement.

(ii)  Loss runs showing paid claims on a monthly, year-to-date, and inception-to-date basis, the date when each claim was first reported to the Administrator and outstanding reserves remaining at the end of each month, by state, and categorized as indemnity, medical payment, or loss adjustment expense, and any other information required for the Company's annual financial statement or by state regulatory agencies. Loss adjustment expenses shall be further categorized as allocated loss adjustment expenses ("ALAE") or unallocated loss adjustment expenses ("ULAE") based on the revised NAIC definitions of ALAE and ULAE to be used for reporting purposes effective January 1, 1998. ALAE are comprised of defense, litigation and medical cost containment expenses, whether internal or external. ALAE include (but are not limited to) the following expenses: (i) surveillance; (ii) fixed amounts for medical cost containment; (iii) litigation management; (iv) loss adjustment expenses for participation in voluntary and involuntary market pools if reported by accident year; (v) fees or salaries for appraisers, private investigators, hearing representatives, reinspectors and fraud investigators, if working in defense of a claim, and fee or salaries for rehabilitation nurses, if such cost is not included in losses; (vi) attorney fees incurred by reason of a duty to defend, even when other coverage does not exist; and (vii) the cost of engaging experts. ULAE are comprised of those loss adjustment expenses other than ALAE as defined above. ULAE include (but are not limited to) the following expenses: (i) fees of adjusters and settling agents; (ii) loss adjustment expenses for participation in voluntary and involuntary market pools if reported by calendar year; (iii) attorney fees incurred in the determination of coverage, including litigation between the insurer and the policyholder; and (iv) fees or salaries for appraisers, private investigators, hearing representatives, reinspectors and fraud investigators, if working in the capacity of an adjuster.

(iii)  The number (count) of open claims, new claims, claims closed with payment and claims closed without payment, each count being shown:

- monthly and year-to-date
and
by line of business and by state.

(iv)  Claims Register.

11



(v)  Check Register, including outstanding check register.

(vi)  Reserve transaction journal setting forth all reserve changes per claim per line for the applicable reporting period.

(vii)  Large loss listing (as determined by the Company), including cumulative paid and outstanding reserves monthly.

(viii)  Aggregate loss runs (on a paid and incurred basis) by Policy.

(ix)  Quarterly loss development triangles by "Accident Year" listing paid losses, case incurred, reported claim count and open claims count or in a reporting format as agreed between the Company and the Administrator.

(b)  The Administrator shall deliver to the Company electronically, by floppy disk, compact disk, email etc., copies of the Administrator's computer data base ("Computer Data") maintained in support of its Claims Reports.  The Computer Data shall be delivered to the Company in a format (i) acceptable to the Company and any entity which requires the data from the Company, (ii) readable on the Company's and such entity's computer system, and (iii) which complies with the file layout specifications set forth on the attached **Schedule 1**, or any subsequent file layout specifications provided to the Administrator by the Company.  The Computer Data shall consist of all information contained in the Claims Reports including, with respect to each claim, the claim number, the Policy number, the name of the insured, the effective date and expiration date of the Policy, the type of loss by coverage, the date when the claim was first reported to the Administrator, the accident date, the reserve, any paid loss, any paid loss adjustment expenses, and any salvage, subrogation or contribution recovery.

(c)  Subject to the provisions of Section 6.4 (b), closed files shall be retained and preserved by the Administrator for a period of six (6) years from the date of the last file activity or until the expiration of the applicable statute of limitations period, whichever is later ("Retention Period").  At the end of the Retention Period the Administrator shall make written request of the Company for instructions as to the disposition of each closed file.  As authorized by the Company, in writing, the Administrator shall (i) destroy the closed file, (ii) return the closed file to the Company, at the Company's expense, or (iii) store the closed file at the Company's expense which shall not exceed the Administrator's prevailing fee.  All documents and/or copies which are destroyed should be shredded to protect confidential information.  Notwithstanding the forgoing, the Administrator shall retain a file, and the Retention Period shall be deemed extended, until there is a final, binding determination of the claim by settlement, judgment, or otherwise.

(d)  All claims files and records regarding the administration of claims under this Agreement, including the financial records relating to the Claims Account and the payment of claims and Loss Adjustment Expenses, may be audited, examined and copied by the Company, the Company's representatives, any state insurance department or other regulatory authority having jurisdiction and with the Company's prior approval the Company's reinsurers or their representatives, at any time or times during normal business hours.  The Company reserves the right at any time, in its sole discretion, to assume control over a particular claim and to require the Administrator to forward a copy of the claim file to the Company.

(e)  The Administrator shall maintain the confidentiality of all data supplied to or developed by it relating to the claims administered under this Agreement, shall comply with any and all applicable privacy laws, and shall not disclose such data without the prior written consent of the Company,

or as otherwise authorized by the provisions of this Agreement. The Administrator shall not use the name, service mark, logo, or authorized signatures of the Company, or any of its affiliates, in any advertising or promotional material without the prior written consent of the Company.

(f)  Claims files are and shall remain the property of the Company.

(g)  The Administrator shall be prohibited from disclosing or using any nonpublic personal financial information or nonpublic personal health information related to any Policyholder or beneficiary, or to any consumer or customer (as such terms are defined under applicable state and federal privacy laws), except as necessary to carry out its duties and obligations under this Agreement or as otherwise required under applicable state or federal law, including, without limitation, the Gramm-Leach-Bliley Act and any state law or regulation implementing the same.

(h)  The Administrator shall use its best efforts to provide the Company, without charge, with a limited license to use the software system used by the Administrator in connection with the administration and run-off of the Policies under this Agreement, including all computer programs and updated source and object codes ("Software"). The Administrator shall deliver the Software, as well as all necessary manuals and instructions, to the Company within six (6) months after the Effective Date, and shall provide monthly updates and changes thereafter. If the Administrator (i) fails to provide the Software, necessary manuals and instructions to the Company, without charge, within six (6) months after the Effective Date, or (ii) fails to provide updates to the Software and documentation on a monthly basis or as such updates are issued, then the Company may contact the Software vendor directly, and procure a license to obtain and use copies of the Software and necessary documentation from the Software vendor, and charge all expenses for such licenses, Software and documentation to the Administrator, and the Administrator agrees to pay or reimburse the Company for all such incurred costs.

(i)  The Company acknowledges and agrees that its use of Data and Software obtained from the Administrator, shall be limited to the run-off of the Policies under this Agreement, and the furnishing of Data and Software to the Company by the Administrator shall not be construed to convey title to same, or any part thereof, to the Company, and shall not be construed as conferring upon the Company any right to sell, lease, transfer or dispose of all or any portion of the Data or Software (except that same may be used by the Company's designee, if any, for the purpose of administering and running-off the Policies). The Company further agrees that (i) it shall not copy any part of the Data or Software obtained from the Administrator, or the associated source or object code, except as may be required to administer and run-off the business, and (ii) promptly upon completion of the administration and run-off of the business it shall return to the Administrator any Data, Software, source and object codes, and any other documents proprietary to the Administrator which were delivered to the Company by the Administrator pursuant to this Section 2.3.

2.4  Claims Account.

(a)  For purposes of paying claims and claims related expenses, the Company shall establish, fund and maintain a separate bank account ("Claims Account") which the Administrator may draw against as provided in this Agreement. The Claims Account will be a controlled disbursement, zero balance account, with a positive pay feature attached to help mitigate fraud.

(b)  The Company shall fund the Claims Account with amounts necessary to pay all claims and "Loss Adjustment Expenses" (which term, as used in this Agreement, means claims adjustment costs and expenses incurred by the Administrator and allocated by it to the investigation, adjustment and settlement or defense of claims for benefits under the Policies, including without limitation, attorneys' fees

13

and disbursements, pre and post judgment interest, court reporter services and transcripts, deposition charges and transcripts, fees for service of process, court costs, appeal bonds, printing costs related to trials and appeals, fees of witnesses and experts, medical examination and review, laboratory costs, and similar costs reasonably incurred and related to the investigation and defense of claims or the protection and prosecution of subrogation rights of the Company). Notwithstanding anything to the contrary in this Section 2.4(b), Loss Adjustment Expenses shall not exceed loss adjustment expense plus legal costs reimbursed to the Company under the Reinsurance Agreements (the "Reinsurance Agreements") covering business produced under the Agency Agreement and the Policies. Loss Adjustment Expenses shall exclude all Administrator's Expenses.

(c) Checks drawn on the Claims Account by the Administrator, or its agents or employees, shall be signed and issued only in accordance with procedures provided by the Company's Treasury Department to the Administrator. In any case, checks drawn on the Claims Account must be signed by two (2) authorized officers or employees of the Administrator, whose names and positions shall be promptly reported to the Company. To issue any check or checks aggregating in excess of the Check Amount Limit for any one claim, the Administrator shall first send a fax request to the Company for authority to do so and shall not issue such check or checks until it receives specific authorization therefore by fax from the Company.

(d) The Administrator shall maintain a daily register of checks drawn on the Claims Account for each claims payment and Loss Adjustment Expense paid ("Check Register"). The Administrator shall maintain a daily register of each paid and outstanding claim ("Claims Register") which register shall include, for each claim or claimant, the claim number, Policy number, loss date, name of payee, date and check number of the disbursement, and the amount and purpose of the payment. A copy of the Check Register and Claims Register shall be forwarded to the Company monthly. The Administrator will provide the Company's current bank, or any successor or replacement, JP Morgan Chase, with an electronic transmission of all checks drawn on the Claims Account. This electronic transmission will be in the form provided by the Company's Treasury Department and as updated from time to time. The Administrator will provide the electronic transmission to the Company bank simultaneously with the production of each batch of claims and loss adjustment checks drawn on the Claims Account.

2.5 <u>Administrator's Expenses</u>. The Administrator shall have sole responsibility for its own expenses and expenses incurred by (i) the Company or affiliates of the Company at the Administrator's request or as agreed to by the Administrator and the Company, and/or (ii) third parties in order to fulfill the Administrator's responsibilities under this Agreement including administrative expenses and external legal fees in excess of the amount reimbursed to the Company under the Reinsurance Agreement, other than Loss Adjustment Expenses ("Administrator's Expenses"). Administrator's Expenses shall include, without limitation: (a) costs of personnel employed or hired by the Administrator (including subcontractors and agents) to perform services under this Agreement, such costs to include salaries, payroll taxes, overtime, employee benefits, fees, temporary help, and appointment costs, (b) rent, utilities, telephone, furniture, fixtures, equipment, software, postage, advertising, and occupational taxes, and (c) miscellaneous administrative expenses, compliance work expenses and processing costs, (including but not limited to compliance with all applicable privacy laws) licensing fees or costs and other overhead expenses of the Administrator. The Company will charge back to the Administrator on a monthly basis any costs incurred by the Company, or affiliates of the Company, at the Administrator's request or as agreed to by the Company and the Administrator.

2.6 <u>Special Investigation Units</u>. The Company has established a fraud detection program known as a Special Investigation Unit ("SIU") in accordance with Company policy and state law governing SIUs.

The Administrator shall promptly report to the Company's SIU suspected fraudulent claims in order to insure compliance with state and federal anti-fraud statutes and regulations, to avoid underwriting undesirable risks, to facilitate and maintain working relationships with law enforcement agencies, the National Insurance Crime Bureau and the appropriate divisions within the applicable insurance department, and to enable the Company to maintain a database of information related to insurance fraud.

2.7 Independent Contractor.

(a) The Administrator is an independent contractor of the Company, and nothing contained in this Agreement shall be deemed to create the relationship of employer and employee, partners, or joint venturers between the Company and the Administrator.

(b) The Administrator shall not act as an insurer, nor shall it be ultimately responsible for payment or satisfaction of claims against any Policyholder.

(c) The Administrator shall not give, or be required to give, any legal opinion, or provide any legal representation, to any Policyholder or to the Company, any legal opinions or representation to be provided only by duly licensed outside counsel employed for the purpose by the Administrator.

(d) For purposes of interpreting the provisions of this Agreement, the Administrator shall be deemed to be the Company's agent, and it shall perform all of its obligations under this Agreement to the full extent required of an agent under the law.

2.8 Subcontracting. The Administrator may not enter into a subcontract or subcontracts with another person, entity or entities ("Subcontractors", or individually "Subcontractor") pursuant to which such Subcontractor or Subcontractors shall perform any of the services or produce any of the reports to be performed or produced pursuant to this Agreement, except the hiring of independent (i) adjustors, and/or (ii) investigators, , as otherwise permitted under section 2.2(c)(vi) for specific claims and on an as needed basis only, unless the identity of any such Subcontractor and the form and content of any subcontract therewith is approved in advance in writing by the Company. No such subcontract shall relieve the Administrator of responsibility for the fulfillment of any of its obligations hereunder. All Subcontractors are to be advised of the Company's privacy policies and shall agree to comply with such privacy policies.

2.9 Salvage, Subrogation, Contributions, Deductible Reimbursements.

(a) The Company shall establish, maintain and control a separate deposit only bank account (the "Claim Recovery Account") for the deposit of salvage and subrogation recoveries, contributions and deductible reimbursements. The Administrator shall deposit into the Claim Recovery Account immediately upon receipt all sums collected for salvage, subrogation, contribution, or deductible reimbursement (collectively "Claim Recoveries").

(b) The Administrator shall not offset any sums against the Claim Recoveries, including any compensation due the Administrator for recovery and/or collection of such Claim Recoveries. Any compensation due the Administrator for Claim Recovery shall be included in the Administrator's monthly compensation request pursuant to Section 3.1(a) herein.

(c) The Administrator shall maintain a register or other record of all Claim Recoveries (the "Claim Recovery Register"). The Claim Recovery Register shall contain, among other things, the date and amount of the deposit, the date of receipt of the funds, the claim number and the payer and the purpose of payment, and a copy shall be sent to the Company monthly. The Administrator shall reconcile the

Claim Recovery Register and the Claims Register to the Claims Account on a monthly basis.

(d)   The costs of collection for Claim Recoveries shall be (i) limited to necessary payments made to independent third parties, (ii) shall not include any Administrator's expenses referred to in Section 2.5, (iii) shall not include any payments to the Administrator, and (iv) shall be paid by the Administrator from the Claims Account.

### 2.10   Unclaimed Property.

(a)   The Administrator shall comply with the Company's unclaimed property policy ("Unclaimed Property Policy"), as such policy may be amended from time to time.  The Administrator shall maintain a register of all checks, drafts, or other debits from the Claims Account which are unclaimed, uncashed and/or abandoned by the person entitled to receive such payment ("Unclaimed Funds Register").  The information in the Unclaimed Funds Register shall include all information necessary and sufficient for the Company to comply with applicable state unclaimed property laws, including but not limited to, the date and amount of the check, draft or debit, the date of the report, the claim number, the policy number, the payee, the payee's address and the purpose of the payment.  A copy of the Unclaimed Funds Register shall be sent to the Company monthly.  The Administrator shall maintain a separate Unclaimed Funds Register for each state in which claims are administered under this Agreement.

(b)   The Administrator shall comply, and shall ensure the Company complies (as far as the MGU can control), with all applicable laws, rules and regulations related to abandoned and unclaimed property, whether tangible or intangible, including all laws applicable to the escheat or custodial taking of any abandoned or unclaimed property in the possession or control of the Administrator.

## ARTICLE 3
## COMPENSATION OF ADMINISTRATOR

### 3.1   Compensation.

(a)   For all services to be rendered by the Administrator during the term of this Agreement, the Company shall pay the Administrator the fees and other compensation (including any compensation for Claim Recoveries), as set forth on **Exhibit A** attached to the Declarations Page. The Administrator shall submit payment requests in writing to the Company on a monthly basis, in the form provided by the Company, identifying all fees and other compensation due to the Administrator.  The Company shall then pay the fees and other compensation requested to the Administrator within seven (7) days after receipt of the payment requests, unless the Company disputes the payment requests, in which case the undisputed amounts requested shall be paid within seven (7) days after receipt of the payment request.  All payments by the Company to the Administrator shall be made by wire or electronic transfer unless otherwise agreed.

(b)   In the event that the Company's Reinsurance Agreements covering business administered under this Agreement provide for maximum limits with respect to ALAE in any underwriting year, then and in that event the compensation paid to the Administrator shall be reduced by the amount that the ALAE incurred exceeds such maximum limits.

(c)   As security for performance of the Administrator of their obligations under the Claims Agreement, the Administrator shall provide the Company with a clean, irrevocable, and unconditional letter of credit ("LOC") in a form acceptable to insurance regulatory authorities involved and which will be

16

issued for a term of at least one year and will include an "evergreen clause", which automatically extends the term for at least one additional year at each expiration date, unless written notice of non-renewal is given to the Company not less than thirty (30) days prior to said expiration date. The LOC shall be issued by a US bank that is acceptable to the Company. The LOC shall name the Company as the beneficiary. The LOC shall be in the amount of US$300,000; such amount may be adjusted by the Company as necessary while this Agreement is in effect. In the event that the Company decides to change the amount of the LOC the Company may use the ratio of 300/264 times the amount that would have been withheld if Article 2, COMPENSATION OF ADMINISTRATOR, Section 2.1 Compensation, Schedule 2 remained as originally written, in the prior Claims Administration Agreement dated January 1, 2000, as a guide in determining the amount to be withheld under this Addendum.

      (d) The Company shall be entitled to draw against the LOC to reimburse itself by reason of or in connection with any of the following:

      (i)     any breach or non-performance of any covenant or obligation to be observed or performed by the Administrator or any Agent under the Claims Agreement that is not cured to the satisfaction of the Company within thirty (30) days of notification to the Administrator by the Company;

      (ii)    the termination of the Claims Agreement by either party to cover the cost to run-off the in-force business, including the cost of claims run-off pursuant to the terms of the Claims Agreement. The Company shall only draw against the LOC in an amount equal to the expenses required to complete the run-off of the in-force business;

      (iii)   the obligation of the Claims Administrator to refund Unearned Fees, as defined in and pursuant to the terms of the Claims Agreement;

      (iv)   any act of the Administrator for which the Company is entitled to indemnification pursuant to the Claims Agreement. In the event that the Company and the Administrator cannot agree on the level of indemnification due under the Claims Administration Agreement, if any, the Administrator and the Company agree to resolve the dispute in accordance with the provisions contained in Article 8 of this Agreement; and

      (v)    in order to exercise a right of offset for any other sums due the Company under the Claims Agreement.

      (e) Notwithstanding anything contained in Section 3.1(d) above, the Company may draw against the full amount of the LOC and convert the same to a cash deposit in the event of any of the following occur:

      (i)     in the event the Administrator or the Company receives a notice of cancellation of the LOC; and

      (ii)    in the event the Administrator becomes insolvent or formal bankruptcy or insolvency proceedings are filed by or against the Administrator.

      The Company or its designated agents may thereafter use the cash deposit to satisfy any of the Administrators obligations under the Claims Agreement. The cash deposit shall be non-interest bearing. Upon completion of the run-off relating to the in-force business and the satisfaction of all of the Administrators obligations under the Claims Agreement, any remaining funds in the cash deposit shall be returned to the Administrator.

The exhaustion of the LOC or the cash deposit shall not relieve the Administrator of any obligation to perform all of the terms, covenants, and conditions of this Addendum or the Claims Agreement. No presumption that the Administrator has performed their obligations hereunder shall be created through the Company reimbursing itself from the LOC pursuant to this Article.

3.2  Unearned Fees.  The Administrator shall have a continuing obligation to refund to the Company, within ten (10) days of demand, any fees paid to the Administrator which (i) have not yet been earned, and/or (ii) have been reduced in accordance with §3.1(b) of this Agreement (collectively referred to as "Unearned Fees"). To secure the Company's right to recover Unearned Fees, the Company shall have either of the following options:

(a)  Draw against the LOC for the amount of the Unearned Fees as detailed in 3.1 (d) above.

(b)  In lieu of drawing against the LOC the Company may, without prejudice to any other rights it may have, withhold from any compensation due the Administrator any portion thereof which is then unearned or which would constitute a prepayment. In addition, the Company may withhold from any compensation due the Administrator an amount equal to any Unearned Fees paid prior to the Effective Date of this Agreement; the amount to be so withheld to be in the sole discretion of the Company.

3.3  Loss Adjustment Expenses.  Unless otherwise specifically provided in this Agreement, the Administrator shall be solely responsible for issuing payments from the Claims Account for all Loss Adjustment Expenses incurred by or payable to independent third parties in the administration of claims under this Agreement.

## ARTICLE 4
## DUTIES OF COMPANY

4.1  Cooperation.  The Company shall cooperate with the Administrator to the extent reasonably necessary to enable the Administrator to adequately perform claims services under this Agreement, including without limitation, responding promptly to the Administrator's requests for relevant information, meeting as needed with the Administrator or persons designated by the Administrator, making decisions on claim matters as required by this Agreement, and remitting funds to the Claims Account as required.

4.2  Loss Coverage.  The Company shall provide timely and complete loss coverage in accordance with the terms of the Policies. When the Company makes a determination as to coverage under any Policy, any liability, loss, cost or expense relating to such coverage shall be borne solely by the Company and the Company agrees to hold the Administrator harmless with respect to same. When the Administrator denies coverage and such denial is not fully based on applicable law, the terms of the Policies or the Company's explicit written instructions, the Administrator shall be liable for any liability, loss, cost or expense relating to such coverage and agrees to hold the Company harmless with respect to same.

4.3  Administrator's Taxes.  The Company shall have no responsibility for any income taxes (or interest or penalties thereon) imposed upon the Administrator.

4.4  Administrator's Name.  The Company may not use the name, logo or service mark of the Administrator or any of its affiliates in any advertising or promotional material without the prior written consent of the Administrator.

18



## ARTICLE 5
## INDEMNITIES

5.1 Administrator's Indemnity. The Administrator agrees to indemnify the Company, its subsidiaries, successors and assigns, and the shareholders, directors, officers, agents and employees of any of them (collectively "Company Indemnitees"), against and in respect of any and all claims, demands, actions, proceedings, liability, losses, damages (except consequential damages), judgments, costs and expenses, including without limitation, attorneys' fees, disbursements and court costs, administrative fines and other penalties, and any loss in excess of Policy limits, as well as extra-contractual obligations, including but not limited to punitive, exemplary, or compensatory damages, suffered made or instituted against or incurred by the Company Indemnitees, or any of them, and which directly or indirectly arise out of or relate to (i) negligence of the Administrator or its employees or representatives in discharging its obligations to the Company or to the Policyholders, (ii) failure by the Administrator or its employees or representative to comply with any applicable information privacy laws, and/or (iii) any failure by the Administrator, or its employees, representatives, independent adjusters or approved subcontractors to perform its obligations under or relating to this Agreement.

5.2 Company's Indemnity. The Company agrees to indemnify the Administrator, its subsidiaries, successors and assigns, and the shareholders, directors, officers and employees of any of them (collectively "Administrator Indemnitees"), against and in respect of any and all claims, demands, actions, proceedings, liability, losses, damages (except consequential damages), judgments, costs and expenses, including without limitation, attorneys' fees, disbursements and court costs, administrative fines or other penalties, and any loss in excess of Policy limits, as well as extra-contractual obligations, including but not limited to punitive, exemplary, or compensatory damages, suffered, made or instituted against or incurred by the Administrator Indemnitees, or any of them, and which directly or indirectly arise out of or relate to any failure by the Company, or its employees or representatives, to perform its obligations under or relating to this Agreement.

5.3 Survival of Indemnities. The indemnities set forth in this Article shall survive any termination of this Agreement.

5.4 Insurance. The MGU shall acquire and maintain an errors and omissions insurance policy issued by an insurance carrier admitted to transact business in the state of New Jersey, subject to the approval of the Company, with policy limits not less than One Million Dollars ($1,000,000). The policy shall not be written by the Company or an affiliate of the Company. Proof satisfactory to the Company of the issuance and maintenance of such errors and omissions policy shall be submitted annually to the Company not later than April 30th of each year at the request of the Company.

## ARTICLE 6
## TERM AND TERMINATION

6.1 Term. The term of this Agreement shall commence as of the date of this Agreement and shall continue until all claims arising under the Policies have been closed, unless it is terminated earlier as provided in this Article.

6.2 Voluntary Termination. This Agreement may be terminated at any time by the Company, without cause, by giving the Administrator not less than seventy five (75) days prior notice of such termination.



6.3  Termination for Cause.  This Agreement shall terminate:

(a) at the election of the Company, upon notice to the Administrator, if the Administrator becomes insolvent, if it makes an assignment for the benefit of its creditors, if a petition for relief under the Bankruptcy Code is filed by or against it, or if a trustee, receiver or other custodian of its assets is appointed;

(b) at the election of the Company, upon notice to the Administrator, in the event of a Change of Control, unless (i) the Administrator has provided the notice referred to in Section 8.3 and (ii) the Company agrees in writing to such Change of Control;

(c) at the election of the Company, upon notice to the Administrator, (i) only with respect to a specific state, otherwise authorized under this Agreement, if any public authority cancels or declines to renew, or suspends any license in that state which is necessary for the legal performance of the Administrator's obligations in that state, or (ii) in its entirety if any public authority cancels, declines to renew, or suspends, any license or certificate of authority of the Administrator which is necessary to the legal performance of its obligations under this Agreement, or (iii) in its entirety if any license of the Administrator is canceled, suspended or not renewed by reason of fraud or other willful misconduct of the Administrator;

(d) at the election of the Company, upon notice to the Administrator, in the event of any material change in the Company's obligations under the Policies, or in its business prospects, caused by (i) a change in law or insurance regulations or (ii) any suspension, prohibition or cease and desist order or decree issued by any public authority having jurisdiction;

(e) at the election of the Company, upon notice to the Administrator, in the event of the cancellation of, or an adverse change in the terms, conditions or coverage of, the Company's Reinsurance Agreements with respect to the Policies;

(f) at the election of the Company, upon notice to the MGU, if the reinsurance coverage in effect or any renewal thereof is either not available or not agreeable to the Company, in its sole discretion; or

(g) upon the filing by or against the Company of a petition for relief under the Bankruptcy Code, or the issuance of an order of liquidation or rehabilitation or similar action against the Company by any public authority having jurisdiction;

(h) at the election of the Company, upon notice to the Administrator, if the Administrator commits any of the following acts or omissions: fraud, gross negligence, or willful misconduct (which includes but is not limited to willful violation of the Company's instructions or willful violation of any applicable law, rule or regulation governing or relating to the Administrator's performance of services under this Agreement); or

(i) at the election of the Company, if the Administrator materially breaches any provision of this Agreement and fails to cure such breach within ten (30) days after notice of the breach is given to the Administrator by the Company. For purposes of this Subsection, routine differences in accounting methods of the Administrator and the Company which involve minor amounts of money and do not involve recoveries collected and knowingly withheld by the Administrator, shall not constitute a failure to account and remit funds to the Company provided all items not in dispute are paid in accordance with the

20

procedures set forth in this Agreement.

(j) at the election of the Company, in the event the MGU materially breaches any provision of the MGU Agreement and fails to cure such breach, to the satisfaction of the Company, within thirty (30) days after notice of breech is given to the MGU.

6.4 <u>Procedures Upon Termination</u>. The following procedures shall be followed in the event of a termination of this Agreement:

(a) The Administrator shall promptly return to the Company, or destroy with the Company's permission, forms or other supplies imprinted with the Company's name regardless of who incurred the cost for the same.

(b) Upon termination of this Agreement the Company shall have either of the following options:

(i) To assume control of such claim files (whether open or closed) as the Company may elect, in which case the Administrator shall promptly transfer such claim files to a location specified by the Company. The Administrator shall cooperate fully with the Company to effect a prompt and orderly transfer of the claim files to the Company or its representatives for the purpose, among others, of preventing an increase in the Company's liability for claims and Loss Adjustment Expenses.

(ii) To require the Administrator to continue to administer to a conclusion all open claims. The Claims Account, in such case, shall continue to be maintained by the Company.

(c) If the Administrator is unable, or refuses to administer open claims, or if the Company elects to assume control of such claim files pursuant to section 6.4(b)(i) herein, the Administrator shall promptly provide the Company, without charge, with a tape back-up of all Computer Data.

6.5 <u>Adjustment of Pre-Payment Upon Termination; Indemnity</u>.

(a) Upon termination of this Agreement the Company shall pay the Administrator for services rendered on a *pro rata* basis. The Administrator shall return to the Company any Unearned Fees within thirty (30) days after demand. The final determination of payments owed in accordance with this Subsection shall be made by auditors or accountants selected by the Company.

(b) If this Agreement terminates for any reason other than a voluntary termination by the Company under Section 6.2, and if the Company takes back open claim files from the Administrator or assigns the administration of such files to a third party, the Administrator agrees to indemnify the Company Indemnities against and in respect of all costs and expenses related to the administration of such claims.

6.6 <u>Suspension of Administrator's Authority</u>. The Company may suspend the Administrator's authority to administer and adjust claims during the pendency of any dispute regarding termination of this Agreement.

6.7 <u>No Consequential Damages</u>. Neither the Administrator nor any of its employees or representatives shall have or assert any claim against the Company, its subsidiaries, successors or assigns, or the shareholders, directors, officers, agents or employees of any of them, for loss of business, loss of



profits, or damage to goodwill or reputation, as a result of the termination of this Agreement.

## ARTICLE 7
### NOTICES

Any notice or other communication hereunder shall be in writing and shall be deemed fully made or given (a) when hand delivered, (b) on the business day after it is delivered to a recognized overnight courier service for overnight delivery to a party at the address of such party as stated in Item A of the Declarations (or to such other address as such party may have fixed by notice) to the attention of the President, or (c) three (3) business days after it is mailed to a party, postage prepaid, by registered or certified mail, return receipt requested, addressed to such party at its address as stated in Item A of the Declarations (or to such changed address as such party may have fixed by notice) to the attention of the President.

## ARTICLE 8
### MISCELLANEOUS

8.1 Assignment. The Administrator shall not assign or otherwise transfer this Agreement or any rights hereunder without the prior written consent of the Company.

8.2 Trust Funds.

(a) In any action or proceeding brought by the Company to recover funds due the Company or the Policyholders under this Agreement (collectively "Trust Funds"), the Administrator shall be obligated to account on its own records for such Trust Funds and to pay the Company all sums for which it cannot account. The Company shall be entitled to bring any action or proceeding available at law or equity to recover Trust Funds and to assert claims therein, including without limitation, claims for an accounting, for breach of contract and for conversion. In any such action or proceeding it shall be conclusively presumed that the Administrator is a fiduciary of the Company with respect to Trust Funds and is liable to the Company for Trust Funds which have not been timely paid to the Company or to the Claims Account as required by this Agreement; and the Administrator waives (i) any right it may have to assert any counterclaim, cross-claim, or set-off in the action or proceeding, and (ii) the right to trial by jury and any claim that the forum or situs is inconvenient. The Administrator shall retain the right to bring any separate proceeding it deems appropriate to recover any claims it may have as a creditor of the Company, or otherwise, but the pendency of such proceeding shall not delay, hinder or defeat the Company's right to promptly recover any Trust Funds then due or to levy upon any judgment therefor.

(b) The Administrator shall cause the principal shareholder(s) and the president of the Administrator to execute and deliver to the Company a guarantee of payment of the Trust Funds. The guarantee shall be in the form attached as **Schedule 2**. Notwithstanding the foregoing in this Section 8.2(b), a guarantee of payment of the Trust Funds shall not be required if the Administrator is a publicly traded company listed on the NYSE, AMEX or NASDAQ.

8.3 Change of Control. The Administrator shall notify the Company in writing at least thirty (30) days prior to any of the following occurrences, each of which shall be deemed a "Change of Control":

(a) A sale, transfer, pledge, or the issuance to a new shareholder or member, of ten (10%) percent or more of the voting stock or membership interests of the Administrator; or

22



(b) A sale, transfer or pledge of a substantial portion of the material assets of the Administrator, or any merger or consolidation of the Administrator with another entity or entities; or

(c) A change in any director or principal officer of the Administrator; or

(d) An assignment or transfer of this Agreement or any rights hereunder by the Administrator.

8.4  Governing Law; Consent to Jurisdiction. This Agreement shall be governed in all respects, including its validity, construction and performance, by the laws of the state of New York applicable to contracts to be performed in the state of New York. The parties agree that any action or proceeding, however characterized, arising out of or relating to this Agreement shall be brought in the courts of the state of New York sitting in the county of New York or the federal court for the Southern District of New York, and the parties hereby irrevocably submit to the non-exclusive jurisdiction of any such court for the purposes of any such action or proceeding and irrevocably agree to be bound by any judgment rendered by any such court with respect to any such action or proceeding. The parties hereby waive any objection they may now or hereafter have to the venue of any such action or proceeding in any such court and any claim that such action or proceeding has been brought in an inconvenient forum. The parties agree that in any action or proceeding arising out of or relating to this Agreement, or the enforcement of any provisions thereof, the Court is empowered to grant any legal or equitable relief which may be available, including without limitation, specific performance, injunctive relief and any mandatory injunction it deems appropriate.

8.5  Waiver of Jury Trial. TO THE FULLEST EXTENT PERMITTED BY LAW, EACH OF THE PARTIES HERETO HEREBY WAIVES THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY DEALINGS BETWEEN THEM ARISING OUT OF OR RELATING TO THE SUBJECT MATTER OF THE TRANSACTIONS CONTEMPLATED HEREIN. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that arise out of or relate to the subject matter of this Agreement, including, without limitation, contract claims, tort claims, breach of duty claims, and all other common law and statutory claims. This waiver shall apply to any subsequent amendments, renewals, supplements or modifications to this Agreement.

8.6  Waiver of Certain Defenses. Each of the parties hereto waives their respective rights to assert the defenses of laches, statute(s) of limitation or any other defense based upon the theory that the pertinent cause of action is time-barred or stale.

8.7  No Third Party Benefits. This Agreement is for the sole and exclusive benefit of the parties and their successors and permitted assigns, and no third party is intended to or shall have any rights hereunder.

8.8  No Waiver. The failure of either party to insist upon strict compliance with any provision of this Agreement, or to exercise any right or remedy under this Agreement, shall not constitute a waiver by such party of the provision or prevent such party from exercising such right or remedy in the future.

8.9  Entire Agreement. This Agreement, and the Schedules attached, sets forth the entire understanding of the parties with regard to its subject matter, and supersedes and merges all prior discussions, agreements, promises, representations, warranties and arrangements between them with regard to such subject matter. Neither party shall be bound by any agreement, representation or warranty



regarding such subject matter other than as expressly set forth in this Agreement or in a subsequent writing signed by the party to be bound thereby. This Agreement may not be modified or supplemented, nor may any provision be waived, except by a writing signed by the party to be bound thereby.

8.10  Severability. If any provision of this Agreement is held to be invalid or unenforceable, such impediment shall attach only to such provision and shall not render invalid or unenforceable any other provision of this Agreement.

8.11  Headings. The headings used in this Agreement or in any Schedules are inserted for convenience only and shall not affect the meaning or interpretation of the Agreement.

8.12  Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same instrument.

8.13  Schedules. The Schedules referred to in this Agreement are an integral part of, and shall be deemed incorporated in, the Agreement.

8.14  Further Assurances. The parties shall execute and deliver such other documents or instruments and take such other action as may be reasonably required to more effectively implement the provisions and intent of this Agreement.

8.15  Benefit of Parties. This Agreement shall bind and benefit the successors and permitted assigns of the parties.

8.16  Survival. All of the terms, covenants, agreements, obligations, conditions, representations and warranties set forth in this Agreement and in any document or other writing delivered pursuant hereto, shall survive the termination of this Agreement and shall continue in full force and effect so long as any liability or obligation under this Agreement is outstanding or unpaid.

8.17  Violent Crime Control and Law Enforcement Act of 1994. The Administrator represents and warrants to the Company on the date hereof that the Administrator is in compliance with the Violent Crime Control and Law Enforcement Act of 1994 and that none of the Administrator's officers, directors, employees, agents, subcontractors, or other persons authorized to act on behalf of the Administrator, has ever been convicted of any state or federal criminal felony involving dishonesty or a breach of trust or any crime under 18 U.S.C. § 1033, unless such individual has obtained the prior written consent of the insurance regulatory official possessing regulatory authority over such individual.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers as of the day and year first above written.

Attest:                          HEALTH PLAN ADMINISTRATORS, INC.

_____    By: _____

                              Title: _____

Attest:                          CLARENDON NATIONAL INSURANCE COMPANY

24

By: _____
Title: _____

DOMINIC J. HAGGER
SENIOR VICE PRESIDENT
CLARENDON NATIONAL INSURANCE COMPANY

## SCHEDULE 1

### Claim Master Fields Listing

Following are field descriptions, attributes, maximum lengths and definitions for the Claim Record

| Claim Master | Type | Length | Required | Sample | Definitions |
|---|---|---|---|---|---|
| Program ID | Number | 6 | Yes | 34 | Program number is the number assigned to this program by CNIC |
| Claim Number | Character | 30 | Yes | 12345678901234 | Alphanumeric code used by a program to identify a claim |
| Policy Number | Character | 30 | Yes | 00000001 | An alphanumeric code to identify a Group Number or Individual Policy Number, depending on the program structure |
| Policy Effective Date | Date | 10 | Yes | 10/10/1997 | Effective date of the policy term or the employee hire date, that the claim attaches in year 2000 format MM/DD/YYYY * |
| Date of Service | Date | 10 | Yes | 05/10/1997 | Date of service, MM/DD/YYYY |
| Report Date | Date | 10 | Yes | 10/09/1997 | Date reported to agent-company in year 2000 format, MM/DD/YYYY |
| Close Date | Date | 10 | No | 09/30/2000 | Date claim closed in year 2000 format, MM/DD/YYYY; required if claim is closed |
| Reopen Date | Date | 10 | No | 11/30/1997 | Date claim is reopen for a loss payment and or reserve set up in year 2000 format, MM/DD/YYYY |
| System Date | Date | 10 | Yes | 10/23/1997 | A date assigned to a transaction by the system in a year 2000 format, MM/DD/YYYY. (Generally the date the claim is processed) |
| Accounting Date | Date | 10 | Yes | 10/31/1997 | The last day of an accounting period in year 2000 format, MM/DD/YYYY |
| Comments | Character | 40 | No | Gen. Com. On Clmt. | Comments about this record |
| Policy Risk State | Character | 2 | No | ND | For Group A&H, this is the Home Office State |
| Catastrophe Number / Occurrence Code | Character | 50 | No | 0002 | List each claim by individual (SS# or other unique identifier) |

### Claimant Master Fields Listing

Following are field descriptions, attributes, maximum lengths and definitions for the Claimant Record

| Claimant Master | Type | Length | Required | Sample | Definitions |
|---|---|---|---|---|---|
| Program ID | Number | 6 | Yes | 34 | Program number is the number assigned to this program by CNIC |
| Claim Number | Character | 30 | Yes | 12345678901234 | Alphanumeric code used by a program to identify a claim |
| Claimant Number | Number | 6 | Yes | 1 | Default to 1, as there are no multiple claimants on A&H Claims |
| AS Line | Character | 4 | Yes | | AS Line Code refer to "Annual Statement Yellow Book" |
| Agent's Line of Business | Character | 40 | Yes | Collision | To distinguish multiple lines from an annual statement line* |
| Deductibles | Number | 22 | Yes | 10,000.00 | A dollar deductible on this line of business for this risk. If N/A place 0 |
| Indemnity Paid | Number | 22 | Yes | 0 | N/A for A&H |
| Indemnity Reserves | Number | 22 | Yes | 0 | N/A for A&H |
| Medical Paid | Number | 22 | Yes | 1000.00 | Monthly paid loss dollars on this claimant. If N/A place 0 |
| Medical Reserves | Number | 22 | Yes | 500.00 | As of reporting date loss reserves on this claimant. If N/A place 0 |
| Expense/Other Paid (Legal) | Number | 22 | Yes | 67,890.00 | Monthly paid loss dollars on this claimant. If N/A place 0 |
| End Of Month Date | Date | 10 | Yes | 10/31/1997 | The last day of an accounting period in year 2000 format, MM/DD/YYYY |
| Comments | Character | 40 | No | Gen. Com. On Clmt. | Comments about this record |
| Expense Reserves (Legal) | Number | 22 | Yes | 1000000.00 | As of reporting date LAE reserves on this claimant. If N/A place 0 |
| Unallocated Expense Paid | Number | 22 | Yes | 1000.00 | Monthly paid loss dollars on this claimant. If N/A place 0 |
| Unallocated Expense Reserves | Number | 22 | Yes | 2000.00 | As of reporting date loss reserves on this claimant. If N/A place 0 |
| Claimant Name | Character | 50 | Yes | Alfred E. Newman | Claimant Name |



## Payment Master Fields Listing  (Monthly Check Register)
Following are field descriptions, attributes, maximum lengths and definitions for the Payment Record

| Payment Master | Type | Length | Required | Sample | Definitions |
|---|---|---|---|---|---|
| Program ID | Number | 6 | Yes | 34 | Program number is the number assigned to this program by CNIC |
| Claim Number | Character | 30 | Yes | 12345678901234 | Alphanumeric code used by a program to identify a claim |
| Claimant Number | Number | 6 | Yes | 1 | Default to 1, as there are no multiple claimants on A&H Claims |
| Payment Transaction Code | Number | 2 | Yes | 10 | Numeric code provided by CNIC |
| 1099 Flag | Character | 3 | Yes | Yes/No | Option must be filled in |
| Federal ID | Character | 11 | No | | If 1099 is yes - must be filled in |
| Payee name1 | Character | 40 | Yes | John O.Doe | Name of payee |
| Payee name2 | Character | 40 | No | | Name of payee-additional space |
| Payee Address1 | Character | 40 | Yes | 125 Bay Parkway | Address of payee |
| Payee Address2 | Character | 40 | No | | Address of payee-additional space |
| Payee City | Character | 20 | Yes | Brooklyn | City of payee |
| Payee State | Character | 2 | Yes | NY | State of payee |
| Payee Zip | Character | 10 | No | 11214-1234 | Full zip code of payee if available |
| Check Number | Character | 10 | No | L-1589723 | Check number on payment* |
| Check Date | Date | 10 | No | 12/31/2000 | Date on check in year 2000 format, MM/DD/YYYY* |
| Check Amount | Number | 22 | No | 56,466.00 | Total amount of payment* |
| Indemnity Paid Amount | Number | 22 | Yes | 0 | N/A for A&H |
| Medical Paid Amount | Number | 22 | Yes | 54,000.00 | Payment made on this claim.  If N/A place 0 |
| Expense /Other Paid Amount | Number | 22 | Yes | 1,234.00 | Payment made on this claim.  If N/A place 0 |
| System Date | Date | 10 | Yes | 10/23/1997 | A date assigned to a transaction by the system in a year 2000 format, MM/DD/YYYY |
| Accounting Date | Date | 10 | Yes | 10/31/1997 | The last day of an accounting period in year 2000 format, MM/DD/YYYY |
| Comments | Character | 40 | No | Gen Com. On Clmnt. | Comments about this record |

\* The Check Number, Check Date and Check Amount fields are optional if the Payment Transaction Code field is
11, 12, 13, 14, 18, 19, 20, 21, 28, 29, 30, 31, 32, 33, 34, 35, 37, 38 otherwise these fields are required.


## Outstanding Checks Fields Listing
Following are field descriptions, attributes, maximum lengths and definitions for the Outstanding Checks Record

| Outstanding Checks | Type | Length | Required | Sample | Definitions |
|---|---|---|---|---|---|
| Program ID | Number | 6 | Yes | 34 | Program number is the number assigned to this program by CNIC |
| Check Number | Character | 15 | Yes | L-1589723 | Check number on payment |
| Check Amount | Number | 22 | Yes | 36,698.50 | Total amount of payment if N/A place 0 |
| Check Date | Date | 10 | Yes | 12/31/2000 | Date on check in year 2000 format, MM/DD/YYYY |



### SCHEDULE 2

### GUARANTEE OF PAYMENT OF TRUST FUNDS

#### RECITALS

A.  CLARENDON NATIONAL INSURANCE COMPANY (the "Company") and HEALTH PLAN ADMINISTRATORS, INC.(the "Administrator") are parties to a Claims Administration Agreement dated March 1, 2004 (the "Claims Agreement"), pursuant to which, among other things, (i) loss payments and related loss adjustment expenses, salvage, subrogation and contribution recoveries and collections, deductible reimbursement collections  and any other funds due the Company or due the insureds under the Policies covered by the Claims Agreement are defined as and deemed to be "Trust Funds" with respect to which the  Administrator is a fiduciary of the Company, and (ii) the Administrator is obligated to cause the principal shareholder(s) and the president of the Administrator to guarantee payment of the Trust Funds.

B.  J Kim Walker (the "Guarantor") is a principal shareholder, the president or the parent company of the Administrator.

NOW, THEREFORE, in consideration of the mutual promises exchanged in the Claims Agreement, the Guarantor hereby unconditionally guarantees to the Company, its successors and assigns, the full and prompt payment of Trust Funds as and when they are due and payable pursuant the Claims Agreement.

The Guarantor further agrees as follows:

1.  The Guarantor waives (a) notice of, and consent to, any amendment or extension of the Claims Agreement, (b)  notice of any non-performance of, or default under, the Claims Agreement, (c)  trial by jury in any action brought on this guarantee as well as any right to interpose a defense based upon any statute of limitations or claim of laches, and (d) the performance of every condition precedent to which the Guarantor or the Administrator might otherwise be entitled by law.  The Guarantor agrees that the Company may institute an action or claim under this guarantee without joining the Administrator as a party.

2.  The Company shall have no obligation to mitigate the Guarantor's liability under this guarantee, and nothing herein shall require the Company, as a condition of this guarantee, to take any action against the Administrator to enforce payment of Trust Funds or to realize on the Company's security interest in any collateral provided for under the Claims Agreement; and any of the foregoing actions taken by the Company shall not be deemed an election of remedies or waiver of any rights under this guarantee.

3.  The obligations of the Guarantor under this guarantee shall be absolute and unconditional and shall remain in full force and effect without regard to, and shall not be released, suspended, discharged, terminated, or otherwise affected by, any circumstance or occurrence, including without limitation: (a) any renewal, extension, amendment or substitution of, addition or supplement to, or deletion from, this guarantee or the Claims Agreement, (b) any waiver, consent, extension, indulgence or other action or inaction under or in respect of this guarantee or the Claims Agreement, (c) any furnishing of additional security to the Company or release of security by the Company, (d) any limitation on any party's liability or obligations under this guarantee or the Claims Agreement, (e) any bankruptcy,

insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding relating to the Guarantor or the Administrator, or any assets pledged to the Company by either of them, or any action taken with respect to this guarantee or the Claims Agreement by any trustee or receiver, or by any court, in any such proceeding, whether or not the Guarantor or the Administrator shall have knowledge of any of the foregoing, and (f) any unenforceability, illegality or invalidity of the obligation being guaranteed hereunder.

4. This guarantee and its validity, construction and performance shall be governed in all respects by the laws of the State of New York. Any action or proceeding arising out of or relating to this guarantee or the enforcement thereof shall be brought in the Supreme Court of the State of New York, County of New York, or in the United States District Court for the Southern District of New York, and the Guarantor submits and consents to the non-exclusive jurisdiction of either of such courts for the purposes of such action or proceeding; and the Guarantor further consents that process in any such action or proceeding may be served by registered or certified mail addressed to the party at his or its last known address, and such service shall be sufficient to confer *in personam* jurisdiction over the party so served.

5. This guarantee:

(a) may not be terminated, amended or supplemented, nor may any provision be waived, except by a writing signed by the party to be bound thereby;

(b) may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same instrument;

(c) shall bind and benefit the heirs, executors, administrators, personal representatives, successors and assigns of the Guarantor and the Company.

Dated: _3 - 1_____ 200_4_ .

_____
Guarantor

# Alpine Bank

P.O. Box 6086 / Rockford, IL 61125-1086 / 815/398-6500

| | | | | | |
|---|---|---|---|---|---|
| **Main Office** | **Cherry Valley Office** | **Machesney Park Office** | **Spring Creek Office** | **East State Office** | **Logli Offices:** |
| 1700 North Alpine | Cherryvale Drive | Harlem Road & North Second | Spring Creek & Mulford | East State & Perryville | Harlem & Alpine |
| Fax 815/398-0635 | Fax 815/332-4210 | Fax 815/636-9531 | Fax 815/877-2451 | Fax 815/231-1787 | East State Street |
| | | | | | Rockford Plaza |

Date:     April 22, 2005

Beneficiary: Clarendon National Insurance Company – 7 Times Square, 36th and 37th Floor, New York, NY  10036

Letter of Credit No. 1335

Gentlemen:

By order of our client, <u>Health Plan Administrators, Inc.</u>, (the "Applicant"), we hereby open our clean, irrevocable and unconditional Letter of Credit No. <u>1335</u> in your favor for an amount not to exceed in aggregate USD <u>One Hundred Fifty Thousand and No/100 ($150,000)</u> effective immediately and expiring at the office of our <u>Alpine Bank of Illinois, 1700 North Alpine Road, Rockford, IL  61107</u> or such other office as we may advise you from time to time (the "Office"), on <u>April 22, 2008</u>.

Funds hereunder are available to you against presentation of your Sight Draft(s), drawn on us, mentioning thereon our Letter of Credit Number <u>1335</u> in the form of Annex A, attached hereto, accompanied by your written and dated Statement in the form Annex B, attached hereto.

Except as expressly stated herein, this undertaking is not subject to any agreement, condition or qualification. The obligation of <u>Alpine Bank of Illinois</u> (bank), under this letter of credit, is the individual obligation of the bank and is in no way contingent upon reimbursement with respect thereto. The obligation of the bank under this letter of credit is unconditional, and is not dependent on the ability of the bank to perfect a lien, security interest, or any other reimbursement.

It is a condition of this Letter of Credit that it shall be deemed automatically extended, without amendment, for additional period(s) of one year from the expiry date hereof, or any future expiration date, unless at least thirty (30) days prior to any expiration date we notify you by Registered Mail or by any other receipted means that we elect not to consider this Letter of Credit renewed for any such additional period, whereupon you may draw for the available amount under this Letter of Credit by means of your sight Draft(s), drawn on us, mentioning our Letter of Credit number, in the form of Annex A.

It is a condition of this letter of credit that it is transferable and may be transferred in its entirety, but not in part, and may be successively transferred by you or any transferee hereunder to a successor transferee(s). Transfer under this letter of credit to such transferee shall be effected upon presentation to us of the original of this Letter of Credit and any amendments hereto accompanied by a request designating the transferee in the form of Annex C attached hereto appropriately completed, along with payments of ¼ of one percent (minimum $200) as a transfer fee.
We hereby agree to honor each Draft drawn under and in compliance with the terms and conditions of this Letter of Credit if presented, as specified at our Office on or before expiration date.

Should you have occasions to communicate with us regarding this Letter of Credit, please direct your correspondence to our Office, making specific mention of the Letter of Credit number indicated above.

Except as far as otherwise expressly stated herein, this Standby Letter of Credit is subject to the International Standby Practices ("ISP98"), International Chamber of Commerce, Publication No. 590, and as to matters not governed by the ISP98, shall be governed by and construed in accordance with the laws of the State of Illinois and applicable U.S. Federal Law.

By: _____
Margaret K. Wilkerson
Senior Vice President

By: _____
David A. Thompson
Executive Vice President

Member FDIC

**ANNEX A**

**FORM OF SIGHT DRAFT**

Date: _____

To:   Alpine Bank of Illinois
      1700 North Alpine Road
      Rockford, IL 61107

At sight, pay to order of <u>Clarendon National Insurance Company</u> the sum of <u>One Hundred Fifty</u> <u>Thousand Dollars ($150,000.00)</u>.

Drawn under Letter of Credit No. <u>1335</u>, dated <u>April 22, 2005</u>.

BENEFICIARY:

<u>Clarendon National Insurance Company</u>

_____ (Beneficiary's Signature)

BY: _____ (Print Name of Signatory)

## ANNEX B

## FORM OF WRITTEN STATEMENT

To:    Alpine Bank of Illinois
       1700 North Alpine Road
       Rockford, IL 61107

Date:    _____

Dear Sirs,

Irrevocable Letter of Credit No. 1335

We refer to the above referenced Letter of Credit.

"The undersigned, the beneficiary of the above referenced Letter of Credit, hereby certifies that Health Plan Administrators (applicant) has failed to comply with the terms and conditions of a certain Claims Administration Agreement made between Clarendon National Insurance Company (Beneficiary) and Health Plan Administrators (Applicant).

Payment under the above referenced Letter of Credit should be made to our account No. _____ with _____ .

Beneficiary:

Clarendon National Insurance Company

_____ (Beneficiary's Signature)

BY: _____ (Print Name of Signatory)

## ANNEX C
## REQUEST FOR FULL TRANSFER
## RELINQUISHING ALL RIGHTS AS BENEFICIARY

To:   Alpine Bank of Illinois                    Date: _____
      1700 North Alpine Road
      Rockford, IL 61107

      Re:        L/C No. 1335

      Issued by:   Alpine Bank of Illinois

      Ref:        Health Plan Administrators, Inc.

Gentlemen:

Receipt is acknowledged of the original instrument which you forwarded to us relative to the issuance of a Letter of C redit (herein c alled the "Credit") bearing your reference number a s above in favor of ourselves and/or Transferees and we hereby request you to transfer the said Letter of Credit, in its entirety, to:

whose address is   _____

_____

(Optional) Please advise Beneficiary through the below-indicated Advising Bank:

_____

We are returning the original instrument to you herewith in order that you may deliver it to the Transferees together with your customary letter of transfer.

It is understood that any amendments to the Letter of Credit which you may receive are to be advised by you directly to the Transferee and that the drafts and documentation of the Transferee, if issued in accordance with the conditions of the Letter of Credit, are to be forwarded by you directly to the party for whose account the credit was opened (or any intermediary) without our intervention.

Page 2

Request for Full Transfer relinquishing all Rights as Beneficiary

Ref: _____

We understand that the Transfer charge ($750.00) on the amount being transferred (minimum $200.00)

We enclose your check for $_____ to cover your charges.

We authorize you to charge our Bank, account No. _____.


SIGNATURE GUARANTEED                    Sincerely yours,

The First Beneficiary's signature(s) with
Title(s) conforms to that on file with Us
and such is/are authorized for the
Execution of this instrument.


_____         _____
(Name of Bank)                          (Name of First Beneficiary)


_____         _____
(Bank Address)                          (Telephone Number)


_____         _____
(City, State, Zip Code)                 (Authorized Name and Title)


_____         _____
(Telephone Number)                      (Authorized Signature)


_____         _____
(Authorized Name and Title)             (Authorized Name and Title)
                                        (If applicable)


_____         _____
(Authorized Signature)                  (Authorized Signature)
                                        (If applicable)